UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HUU NGUYEN,<br><br>   Plaintiff,<br><br>   v.<br><br>NISSAN NORTH AMERICA, INC.,<br><br>   Defendant. | Case No. 16-CV-05591-LHK<br><br>**ORDER DENYING MOTION FOR CLASS CERTIFICATION**<br><br>Re: Dkt. No. 63 |

Plaintiff Huu Nguyen ("Plaintiff") sues Defendant Nissan North America, Inc. ("Nissan") for causes of action arising out of Nissan's allegedly deceptive sale of vehicles containing a defective manual transmission. Plaintiff moves to certify two classes of individuals who purchased vehicles containing the defective transmission, and Nissan has opposed the motion. Having considered the submissions of the parties, the relevant law, and the record in this case, the Court hereby DENIES Plaintiff's Motion for Class Certification.

**I.   BACKGROUND**

   **A.   Factual Background**

Plaintiff seeks to represent a class of consumers who purchased or leased any Nissan vehicle equipped with the FS6R31A manual transmission. ECF No. 35 ("FAC") ¶ 1. These

vehicles include the Nissan 350Z, model years 2007–2009; the Nissan 370Z, model years 2009–2015; the Infiniti G35, model years 2007–2008; the Infiniti G37, model years 2008–2014; and the Infiniti Q60 (hereafter, "Class Vehicles"). *Id.*

### 1. The Clutch Assembly Defect

The FS6R31A manual transmission in Class Vehicles uses a hydraulic clutch system. *Id.* ¶ 8. In a hydraulic clutch system, when the driver depresses the clutch pedal, "fluid pushes from the clutch master cylinder to the slave cylinder, developing hydraulic pressure and ultimately disconnecting the transmission from the engine via the clutch disc to allow for smooth gear shifts." *Id.* The FS6R31A manual transmission utilizes a concentric (or internal) slave cylinder ("CSC"), as opposed to an external slave cylinder. *Id.* The CSC is "placed inside the [bellhousing] unit along with the clutch disc, pressure plate, and flywheel." *Id.*

Plaintiff alleges that the FS6R31A manual transmission in Class Vehicles suffers from "a design flaw in the slave cylinder assembly." *Id.* ¶ 12. Specifically, Plaintiff alleges that the CSC is composed of materials, including plastic, which do not effectively transfer heat. Declaration of Michael Stapleford ("Stapleford Decl.") at 7, 19; *see also* Declaration of Karen Wallace ("Wallace Decl."), Ex. 1, Deposition of James Blenkarn ("Blenkarn Dep.") at 77:9–19. This can lead the clutch system's hydraulic fluid to begin boiling as it circulates through the CSC. Stapleford Decl. at 6–7, 18. As the hydraulic fluid boils, air bubbles form and collapse, which causes the fluid pressure to drop suddenly and prevents the CSC from working properly. Stapleford Decl. at 7; Blenkarn Dep. at 65:15–66:3. Moreover, as the air bubbles form and collapse, the imploding effect of the liquid can erode solid surfaces and release debris into the hydraulic fluid. Stapleford Decl. at 7.

This alleged design flaw in the Class Vehicles' CSCs causes "the clutch to lose hydraulic pressure and fail to engage/disengage gears." FAC ¶ 10. This "causes unsafe conditions, including drivers' inability to shift gears or maneuver the clutch pedal in the Class Vehicles, thereby rendering the vehicles unable to accelerate and decelerate, often while the vehicles are already in motion." *Id.* Plaintiff at times describes this issue using the shorthand of a "sticky clutch." Mot. at

2

7, 9.

### 2. Nissan's Knowledge of the Defect

According to Plaintiff, Nissan "knew or should have known" about the CSC defect "[d]ating back to at least 2008." *Id.* ¶ 15, 49. Plaintiff alleges consumers filed complaints with the National Highway Traffic Safety Administration ("NHTSA") regarding the 2007 Nissan 350Z as early as June 2007, and that beginning at least in 2008 Nissan began investigating clutch pedal malfunctions in Class Vehicles. FAC ¶¶ 51–52 (excerpting consumers' complaints to NHTSA about clutch malfunctions from 2007 onwards); Wallace Decl, Ex. 9 (email exchange suggesting investigation into clutch problems beginning in 2008); *see* Exs. 7–8 (internal reports from 2009 onwards concerning Nissan's investigation clutch problems).

Nissan responded to complaints about the Class Vehicles' clutches by exchanging the hydraulic fluid previously used in newly manufactured Class Vehicles to a hydraulic fluid formulated for higher temperatures, and by issuing a series of service bulletins instructing technicians to do the same for previous model years. Wallace Decl., Exs. 2–3, 14–15 (technical service bulletins); Blenkarn Dep. at 45:9–17; 65:10–14. The service bulletins required technicians to first verify that the CSC was not leaking, the only other root cause of the clutch problems suggested. *See* Blenkarn Dep. at 66:8–24; Wallace Decl., Ex. 14 (technical service bulletin). Plaintiff alleges that this confirmed for Nissan that the problem was heat-related. Mot. at 10; *see* Blenkarn Dep. at 65:10–18 (testifying the hydraulic fluid was changed "[f]or better temperature characteristics" because there was "an issue with DOT 3 [the previous hydraulic fluid] boiling").

Plaintiff therefore alleges that "Nissan knew about and concealed the Clutch Assembly Defect present in every Class Vehicle" from Plaintiff and other class members "at the time of sale, lease, and repair and thereafter." FAC ¶ 24. "[I]nstead of repairing the defects in the Manual Transmission, Nissan either refused to acknowledge [the defects'] existence or performed repairs that simply masked the defects." *Id.*

### 3. Plaintiff Huu Nguyen

Plaintiff is a California citizen. *Id.* ¶ 27. On January 20, 2012, Plaintiff purchased a new

2012 Nissan 370Z vehicle from Stevens Creek Nissan in Santa Clara County, as a college graduation present for his son, Michael Nguyen ("Michael"). *Id.* ¶ 28; Declaration of Michael J. Stortz ("Stortz Decl."), Ex. A, Deposition of Huu Nguyen ("Nguyen Dep.") at 20:7–21:22. On March 25, 2014, Michael was driving the 370Z on the freeway when the clutch pedal lost pressure and did not return from its depressed position. *See* Stortz Decl., Ex. B., Deposition of Michael Nguyen ("Michael Dep.") at 28:2–4; 28:20–29:11, 29:5–14. Michael then took the 370Z to a Nissan dealership, which replaced the CSC at no charge, because the vehicle was still under warranty. *Id.* at 29:22–30:2, 35:22–36:7. On February 6, 2016, Michael experienced a similar problem. FAC ¶ 33. At this point, the 370Z was no longer under warranty. Michael Dep. at 43:24–45:11. Michael therefore took the vehicle to Imperial Motor Sports, where the CSC was again replaced at a cost of $721.75. FAC ¶ 33.

### B. Procedural History

Plaintiff filed a class action complaint against Nissan on September 30, 2016. ECF No. 1. Plaintiff's original complaint sought to represent all persons in the United States who purchased or leased a 2009–2016 Nissan 370Z. ECF No. 1, at ¶ 1. Plaintiff alleged five causes of action against Nissan: (1) violations of California's Consumers Legal Remedies Act ("CLRA"); (2) Violations of California's Unfair Competition Law ("UCL"); (3) Breach of Implied Warranty pursuant to the Song-Beverly Consumer Warranty Act ("Song-Beverly Act"); (4) Breach of Implied Warranty pursuant to the Magnuson-Moss Warranty Act ("Magnusson-Moss Act"); and (5) Unjust Enrichment. *See* ECF No. 1.

On December 14, 2016, Nissan filed a motion to dismiss, which argued Plaintiff's equitable relief claims should be dismissed because Plaintiff has adequate remedies at law. ECF No. 19, at 7. On January 25, 2017, the parties stipulated to allow Plaintiff to file an amended complaint. ECF No. 32. The Court granted the parties' stipulation that same day, and the Court denied as moot Nissan's motion to dismiss the original complaint. ECF No. 33.

On February 1, 2017, Plaintiff filed the First Amended Complaint ("FAC"). *See* FAC. Plaintiff added to the FAC the following vehicles: 2007–2009 Nissan 350Z, 2007–2008 Infiniti

4

Case No. 16-CV-05591-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

G35, the 2008–2014 Infiniti G37, and the Infiniti Q60. Plaintiff's FAC also added allegations in support of Plaintiff's claims for equitable relief. *See id.* at 66–78. Plaintiff's FAC alleged the same five causes of action against Nissan that Plaintiff alleged in the original complaint.

On February 22, 2017, Nissan moved to dismiss the FAC's equitable claims. ECF No. 36. On March 8, 2017, Plaintiff filed an opposition to Nissan's motion to dismiss. ECF No. 38. On March 22, 2017, Nissan filed a reply. ECF No. 39. On April 11, 2017, the Court granted Nissan's motion to dismiss the FAC's equitable claims. ECF No. 41. Specifically, the Court dismissed Plaintiff's UCL claim, Plaintiff's unjust enrichment claim, and Plaintiff's claim for injunctive relief under the CLRA. *Id.* at 9–10. Thus, Plaintiff was left with damages claims based on Plaintiff's causes of action under the CLRA, Song-Beverly Act, and Magnusson-Moss Act. *See id.*

On December 15, 2017, Plaintiff filed the instant motion for class certification. ECF No. 63 ("Mot."). Plaintiff seeks to certify the following proposed classes:

- **Class:** All individuals in California who purchased or leased, from an authorized Nissan dealer, a new Nissan vehicle equipped with a FS6R31A manual transmission.
- **CLRA Sub-Class:** All members of the Class who are "consumers" within the meaning of California Civil Code § 1761(d).

*Id.* at 13.[1] On February 5, 2018, Nissan filed its opposition. ECF No. 76 ("Opp."). On March 2, 2018, Plaintiff filed his reply. ECF No. 85 ("Reply").[2]

## II.    LEGAL STANDARD

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. Rule 23 does not set forth a mere pleading standard. To obtain class certification, plaintiffs bear the burden of showing that they have met each of the four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, *amended by*

---

[1] Plaintiff excludes from the class and subclass "1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; 2) the Judge to whom this case is assigned and the Judge's staff; and 3) those persons who have suffered personal injuries as a result of the facts alleged herein." Mot. at 13 n.5.
[2] Both parties have also filed motions to exclude each other's experts. ECF No. 81; ECF No. 95. The Court considers these separately.

273 F.3d 1266 (9th Cir. 2001). "A party seeking class certification must affirmatively demonstrate . . . compliance with the Rule[.]" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Rule 23(a) provides that a district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). That is, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to maintain a class action. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

If all four prerequisites of Rule 23(a) are satisfied, the Court must also find that the plaintiff "satisf[ies] through evidentiary proof" at least one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). The Court can certify a Rule 23(b)(1) class when plaintiffs make a showing that there would be a risk of substantial prejudice or inconsistent adjudications if there were separate adjudications. Fed. R. Civ. P. 23(b)(1). The Court can certify a Rule 23(b)(2) class if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Finally, the Court can certify a Rule 23(b)(3) class if the Court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim[.]" *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194 (2013) (quoting *Dukes*, 564 U.S. at 351); *see also Mazza*, 666 F.3d at 588 ("'Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23.'" (quoting *Zinser*, 253 F.3d at 1186)). This "rigorous" analysis applies to both Rule 23(a) and Rule 23(b). *Comcast*, 569

6

Case No. 16-CV-05591-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

U.S. at 34 (stating that Congress included "addition[al] . . . procedural safeguards for (b)(3) class members beyond those provided for (b)(1) or (b)(2) class members (e.g., an opportunity to opt out)" and that a court has a "duty to take a 'close look' at whether common questions predominate over individual ones").

Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 133 S. Ct. at 1194–95. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195. If a court concludes that the moving party has met its burden of proof, then the court has broad discretion to certify the class. *Zinser*, 253 F.3d at 1186.

## III.   DISCUSSION

Because the Court finds that Plaintiff has failed to satisfy the predominance requirement of Rule 23(b)(3), the Court does not address the other requirements for class certification. The Court also finds that Plaintiff has failed to justify certification of a Rule 23(c)(4) issues class.

### A.   Rule 23(b)(3)

Under Rule 23(b)(3), plaintiffs must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry" is meant to "tes[t] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The Ninth Circuit has held that "there is clear justification for handling the dispute on a representative rather than an individual basis" if "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022. In ruling on a motion for class certification based on Rule 23(b)(3), a district court must conduct a rigorous analysis to determine whether the class representatives have satisfied both the predominance and superiority requirements. *See Zinser*, 253 F.3d at 1186. The predominance analysis focuses on "the legal or factual questions that qualify each class member's case as a genuine controversy" to determine "whether proposed classes are

sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623; *see also* Fed. R. Civ. P. 23(b)(3) (to certify a class, the court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members").

Although individual damages calculations alone do not make class certification inappropriate under Rule 23(b)(3), *see Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ("[T]he amount of damages is invariably an individual question and does not defeat class action treatment."), the United States Supreme Court has held a plaintiff bears the burden of providing a damages model showing that "damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35. The damages model "must measure only those damages attributable to" the plaintiff's theory of liability. *Id.* If the plaintiff does not offer a plausible damages model that matches her theory of liability, "the problem is not just that the Court will have to look into individual situations to determine the appropriate measure of damages; it is that Plaintiffs have not even told the Court what data it should look for." *In re Myford Touch Consumer Litig.*, 2016 WL 7734558, at *15 (N.D. Cal. Sept. 14, 2016).

Plaintiff's theory of liability is that class members overpaid for their vehicles because Nissan failed to disclose that the CSC was defective. *See* Mot. at 1–3. Accordingly, Plaintiff's damages expert, Steven Boyles, proposes a "benefit of the bargain" damages model. The benefit of the bargain damages model assumes class members bargained for a vehicle with a working CSC and that if Nissan had disclosed the CSC defect, class members would have paid less for their vehicles, or not bought the vehicles at all. ECF No. 62-14, Declaration of Steven Boyles ("Boyles Decl.") at 7. Because class members are entitled to the benefit of the bargain they struck, Boyles contends damages should be the difference between "the value represented [by Nissan] and the value actually received (what the vehicle is worth with and without the defect)." *Id.* The model therefore sets damages equal to the cost to replace the defective CSC with a working CSC, on the theory that this is equal to the difference between the value Nissan represented (a vehicle with a working CSC), and the value class members received (a vehicle with a defective CSC). *Id.* at 7–8.

The cost to replace a defective CSC is based on the findings of Plaintiff's automotive

technical expert, Michael Stapleford. *Id.* at 8–10. Stapleford concludes that the overheating problem can be solved by replacing defective CSCs, which include aluminum and plastic components, with solid aluminum CSCs which "can absorb more heat and better regulate temperature." Stapleford Decl. at 10; *see id.* at 14 ("The thermal models show that an all aluminum CSC design could cool the fluid temperatures by more than 100% compared to a CSC design with a plastic base."). Stapleford also finds that replacing the hydraulic fluid is necessary to prevent future overheating. *Id.* at 7, 19. Boyles therefore sets damages equal to the cost of an aluminum CSC, new hydraulic fluid, other necessary parts (*e.g.* bolt kit), and 3.9 hours of labor, for a total of $723.95 per CSC replaced. Boyles Decl. at 10. Class members' damages would therefore be $723.95 because this is the cost to cure the defect. *Id.* at 9.

This approach is problematic. Under the proposed benefit of the bargain model, damages are the difference between the value Nissan represented and the value class members received, measured at the time of purchase. *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015). However, the difference between value represented and value received only equals the cost to replace the defective CSC *if* consumers would have deemed the defective part valueless. *See Caldera v. J.M. Smucker Co.*, 2014 WL 1477400, at *4 (C.D. Cal. Apr. 15, 2014) ("[A] full refund would only be appropriate if not a single class member received any benefit from the products."). To illustrate, assume a class member receives $723.95 to replace the CSC. Under the benefit of the bargain damages model, the class member has now received full compensation for their injury because they bargained for a working CSC. Boyles Decl. at 7 ("Accordingly, the measure of damages (value that the Class Member bargained for but did not receive) would be a payment in the amount of the average cost of the parts and labor to repair the Clutch Assembly Defect for each Class Member."); *id.* at 9 ("As the formula reflects, using the following prices results in a damage value of $723.95 per Class Vehicle"). However, if the class also derived value from the defective CSC—be it by selling it, repurposing it, or simply driving a ways before replacing it—the class member will have received the full benefit of the bargain *and* the monetary value of the defective part. That is not an appropriate measure of damages. *See, e.g., In re POM*

9

Case No. 16-CV-05591-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

*Wonderful LLC*, 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014) (rejecting damages model because it would grant class members a full refund in addition to the value the class members derived from the challenged food product); *Stathakos v. Columbia Sportswear Co.*, 2017 WL 1957063, at *10 (N.D. Cal. May 11, 2017) (reaching same conclusion in case concerning plaintiffs' purchase of clothing); *Chowning v. Kohl's Dep't Stores, Inc.*, 2016 WL 1072129, at *7–8 (C.D. Cal. Mar. 15, 2016) (same). The damages model therefore errs in assuming that all consumers would discount the amount they would be willing to pay for the vehicle by the full replacement cost of a CSC even though the consumer received some value from the defective CSC.

The Court grants that it is certainly possible that the defective CSC is completely valueless, in which case the replacement cost may be an appropriate damages measure. *See, e.g., Farar v. Bayer AG*, 2017 WL 5952876, at *9–11 (N.D. Cal. Nov. 15, 2017) (approving damages theory seeking full refund because of plausible claims that challenged product was valueless). However, Boyles nowhere states that this is his premise, or justifies making such an assumption—the issue is simply not addressed. *See, e.g., Philips v. Ford Motor Co.*, 2016 WL 7428810, at *22 (N.D. Cal. Dec. 22, 2016) (rejecting damages model because "it assumes without even explicitly stating that the expected utility is $0."); *POM*, 2014 WL 1225184, at *3 (finding damages model fatally flawed because it "depends upon the assumption that not a single consumer received a single benefit" from challenged product).

This failure is all the more striking because there is evidence indicating that the defective CSCs are not valueless. Plaintiff's vehicle was driven for approximately 26,629 miles before the original CSC malfunctioned. FAC ¶¶ 32–33. Nissan replaced the defective CSC at no charge because Plaintiff's car was still within the warranty period. Plaintiff's vehicle was then driven for another 25,000 miles before the replacement CSC malfunctioned. *Id.* Because Plaintiff's car was out of warranty, Plaintiff was charged $270.58 for the replacement CSC. Similarly, an invoice received by a different Nissan owner put the cost for a replacement CSC at $166.68. Boyles Decl. at 11. The extended use of the defective CSCs indicates that they hold at least some value. *See,*

*e.g., In re Myford Touch*, 2016 WL 7734558, at *5 (criticizing plaintiffs' damages theory for assuming allegedly defective car system "had no value whatsoever at the time of purchase" because evidence showed "Plaintiffs still use the [system's] navigation, Bluetooth, and backup camera features, suggesting that [the system], for all its alleged faults, had some utility and residual value.").

On multiple occasions, as explained below, this Court has rejected class action damages models because they assumed that a challenged product was valueless. *See, e.g., Philips*, 2016 WL 7428810, at *19–22; *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2466559, at *15 (N.D. Cal. May 30, 2014); *Bruton v. Gerber Prod. Co.*, 2018 WL 1009257, at *9 (N.D. Cal. Feb. 13, 2018). In *Phillips*, the plaintiffs alleged that the Electronic Power Assisted Steering ("EPAS") in certain Ford vehicles was defective and moved for class certification. *Philips*, 2016 WL 7428810, at *19–22. The plaintiffs' expert proposed an "expected utility" model for class members' damages that, in theory, set damages as the difference between what class members actually paid for the EPAS system and what the class members would have paid if they had known of the risk the EPAS system would fail. *Id.* at 19–21. However, in practice the utility model set damages equal to the total price of a new EPAS system. *Id.* at 20–21 ("Dr. Arnold's report offers the total price of a new EPAS system as the only measure of damages."). There as here, setting damages equal to the cost of a new EPAS system necessarily assumed that the defective EPAS system was valueless, *i.e.* that "the average reasonable consumer would ascribe $0 value to the defective [EPAS] system." *Id.* at 20 (citation omitted). The Court therefore rejected the damages model and denied class certification because, as in the instant case, the plaintiffs' expert never explained why "an average consumer would value the EPAS system at $0." *Id.* at 21; *see id.* at 22 (reiterating same criticism).

Similarly, in *Brazil*, the plaintiff moved to certify a class of individuals who had purchased defendant's food products based on defendant's mislabeling. *Brazil*, 2014 WL 2466559, at *1–2. The plaintiff's expert proposed a "full refund" damages model that would give class members "the entire purchase or 'register' price of the challenged product." *Id.* at 15. The Court rejected the full refund model "because it is based on the assumption that consumers receive no benefit whatsoever

11

from purchasing the identified products. This cannot be the case, as consumers received benefits in the form of calories, nutrition, vitamins, and minerals." *Id.* The Ninth Circuit subsequently affirmed. *Brazil v. Dole Packaged Foods, LLC*, 660 F. App'x 531, 534 (9th Cir. 2016) ("[A] plaintiff cannot be awarded a full refund unless the product she purchased was worthless.").

The Court reaches the same conclusion here. Although Boyles characterizes the damages model as "benefit of the bargain" rather than "full refund" or "expected utility," the model exhibits the same underlying flaw: it presumes purchasers would deem the defective CSC valueless. Absent any justification for this assumption, the benefit of the bargain damages model fails to "measure only those damages attributable to" Plaintiff's theory of liability because it awards damages equal to the value of a non-defective CSC (the benefit of the bargain) without deducting the value of the defective CSC.

Nor is the Court persuaded by Plaintiff's reliance on the acceptance of a benefit of the bargain damages model in *Falco v. Nissan North America Inc.*, 2016 WL 1327474 (C.D. Cal. Apr. 5, 2016). The damages model approved in *Falco* awarded class members the cost to *repair* the allegedly defective part instead of the cost to *replace* it. *Id.* at *12. The approach in *Falco* mitigates concerns that class members will receive a windfall, because it sets damages equal to the amount necessary to make a defective part serviceable, rather than the amount necessary to procure an entirely new part. Moreover, *Falco* did not consider the possibility that awarding repair costs might overcompensate class members when combined with the value of the defective part— the issue was simply not addressed. *See id.* at 11–12.[3]

In sum, the benefit of the bargain damages model fails to "measure only those damages attributable to" Plaintiff's theory of liability because the model assumes without explanation that the defective CSC is worth $0, and by extension fails to justify using the full cost of replacement as the measure between the value Nissan represented and the value Plaintiff received. *Comcast*,

---

[3] Underscoring the windfall problem, short term lessors who never experience the defect during the period of their lease would receive the full replacement cost award, and thus a 100 percent windfall. Plaintiff's 370Z, for instance, did not experience problems with the CSC until after 26,629 miles.

12
Case No. 16-CV-05591-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

569 U.S. at 35. Therefore, Plaintiff "cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* at 34.

### B.     Rule 23(c)(4)

Plaintiff recognizes the flaws in his damages model. Plaintiff's argument for a Rule 23(c)(4) class is explicitly premised on the failure of his damages theory: "This case is particularly suitable for Rule 23(c)(4) treatment, particularly if Plaintiff's class-wide damages model is not sustained, because Class claims turn on uniform resolution of Nissan's liability." Mot. at 21.

Rule 23(c)(4) provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). Consequently, "[e]ven if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23[(c)(4)] authorizes the district court in appropriate cases to isolate the common issues ... and proceed with class treatment of these particular issues." *Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir. 1996). For example, Rule 23(c)(4) can be used "to separate the issue of liability from damages." *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 632 (N.D. Cal. 2015) (quoting *In re Nassau County Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006). However, Rule 23(c) issues classes "must still meet the requirements of Rule 23(a) and (b) (except for the predominance requirement of Rule 23(b)(3))." *Id.* at 633.

Plaintiff devotes under a page of the motion for class certification, and one paragraph of the reply, to argue for certification of a Rule 23(c)(4) class on the issue of liability. Plaintiff's perfunctory argument lacks any comparable examples and, more fundamentally, fails to "articulate why a bifurcated proceeding would be more efficient or desirable" and is "vague as to whether he intends to later certify a damages class, allow class members to individually pursue damages, or has some other undisclosed plan for resolving this case." *Rahman v. Mott's LLP*, 2014 WL 6815779, at *9 (N.D. Cal. Dec. 3, 2014) ("*Rahman I*"), *aff'd*, 693 F. App'x 578 (9th Cir. 2017) ("*Rahman II*"). The Ninth Circuit holds that certification of a Rule 23(c)(4) issues class "is

appropriate only if it materially advances the disposition of the litigation as a whole." *Rahman II*, 693 F. App'x at 579. Here, Plaintiff proposes no path forward for this case and does not explain how Rule 23(c)(4) certification would advance this litigation. Plaintiff baldly states that a classwide liability finding "will establish predominance as to the rest of Plaintiff's claims" but does not attempt to explain why this is so. Mot. at 22. Nor does Plaintiff propose any solution to the damages issue, stating instead that "[o]nce liability has been adjudicated as to the Class, a procedure can be crafted to resolve individual damages." *Id.* Two sentences of speculation simply cannot justify certification of a Rule 23(c)(4) class.

## IV.     CONCLUSION

In sum, the Court finds that Plaintiff has failed to satisfy Rule 23(b)(3) with respect to either the class or the CLRA sub-class, and that Plaintiff has likewise failed to satisfy the requirements of Rule 23(c)(4). Accordingly, the Court DENIES Plaintiff's motion for class certification.

**IT IS SO ORDERED.**

Dated: April 9, 2018

_____
LUCY H. KOH
United States District Judge